NOT FOR PUBLICATION

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

**Caption in Compliance with D.N.J. LBR 9004-2(c)**

In re: 50 Sussex Redevelopment Urban Renewal, LLC, Debtors.

Case No. 26-17635 (MBK)

Chapter 11

50 Sussex Redevelopment Urban Renewal, LLC,

Plaintiff,

v.

Bravo Capital, LLC & BPT 50S Funding LLC,

Defendants.

Adv. Pro. No. 26-01323 (MBK)

Hearing Date: September 17, 2026

*All Counsel of Record*

**MEMORANDUM OPINION**

This matter comes before the Court by way of a Motion to Dismiss (Dkt. No. 5) filed by Defendants, BPT 50S Funding LLC ("BPT") and Bravo Capital LLC ("Bravo" and, together with BPT, the "Defendants"), seeking dismissal of the Adversary Complaint filed by Plaintiff 50 Sussex Redevelopment Urban Renewal LLC (the "Debtor" or "Plaintiff"). The Court has fully reviewed the parties' submissions as well as the arguments raised during the hearing on September 17, 2026. For the reasons that follow, the Motion to Dismiss is GRANTED.

## I. Venue and Jurisdiction

The Court has jurisdiction over this contested matter under 28 U.S.C. §§ 1334(a) and 157(a) and the Standing Order of the United States District Court dated July 10, 1984, as amended September 18, 2012, and June 6, 2025, referring all Bankruptcy cases to the Bankruptcy Court. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (B) and (O). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## II. Background

A thorough recitation of the facts and allegations of this case can be found in the underlying Adversary Complaint (Dkt. No. 1) and in the parties' pleadings with respect to this Motion—including Debtor's Response to the Motion to Dismiss ("Debtors' Resp.", Dkt. No. 8) and Defendants' Reply (the "Reply", Dkt. No. 9). Accordingly, the Court will not repeat them in detail here and, instead, provides the following summary.

In October 2024, BPT—as Administrative Agent for itself and Israel Discount Bank of New York— made a $62.5 million bridge loan (the "Loan") to the Debtors. *Complaint* ¶ 3, Dkt. No. 1; *Debtor's Resp.* 3, Dkt. No. 8-1. The Loan is secured by a 203-unit apartment building in Newark, NJ (the "Property"). *Complaint* ¶ 1; *Mot. to Dismiss* ¶ 9, Dkt. No. 5-2. It is undisputed that the Loan—and accompanying agreement—required Debtor to fund and maintain an interest reserve. Specifically, the "Interest Reserve" provision of the Loan "obligated the Debtor, whenever the balance fell below two months' debt service, to 'make such deposits into the Interest Reserve Account as are necessary' to restore approximately six months of debt service coverage." *Mot. to Dismiss* ¶ 10 (quoting *Loan Agreement* § 3.2.2 (*Ex. E to Krawitz Cert.* at 266), Dkt. No. 5-1). Shortly after obtaining the Loan, Debtor sought to refinance its obligation to BPT through a HUD loan and engaged Defendant Bravo to represent it in the HUD application process.

In the Complaint, Debtor alleges that Bravo delayed the HUD application process and that Defendants interfered with Debtor's principal's attempt to obtain separate financing with another entity, which caused Debtor to exhaust the interest reserve, default on the loan with BPT, and—ultimately—file for bankruptcy. Debtor asserts three counts: (1) fraudulent misrepresentation; (2) breach of contract; and (3) tortious interference. In their Motion, Defendants seek dismissal of all counts of the Complaint for failure to state a claim. In its Reply, Debtor contends it sufficiently pleads three plausible claims for relief against the Defendants and maintains that dismissal is inappropriate at this stage. Debtor wishes to proceed with discovery.

## III. Standard of Review

Defendants seek dismissal of Debtor's Complaint under FED. R. CIV. P. 12(b)(6), made applicable to adversary proceedings through FED. R. BANKR. P. 7012. "To survive a motion to dismiss, a complaint must contain sufficient factual allegations, taken as true, to 'state a claim to relief that is plausible on its face.'" *Fleisher v. Standard Ins.*, 679 F.3d 116, 120 (3d Cir. 2012) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L.Ed.2d 929 (2007)). When reviewing a motion under Rule 12(b)(6), a court must "view the facts alleged in the pleadings and the inferences to be drawn from those facts in the light most favorable to the plaintiff, and judgment should not [be] granted unless the moving party has established that there is no material issue of fact to resolve, and that it is entitled to judgment in its favor as a matter of law." *Leamer v. Fauver*, 288 F.3d 532, 535 (3d Cir. 2002) (citation omitted); *see also Davis v. Wells Fargo*, 824 F.3d 333, 341 (3d Cir. 2016). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 14 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (citing *Twombly* at 556, 127 S. Ct. 1955, 167 L. Ed. 2d 929).

Generally, when ruling on a motion to dismiss, courts "consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record." *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc*., 998 F.2d 1192, 1196 (3d Cir. 1993) (citations omitted); *see also Hartig Drug Co. Inc. v. Senju Pharm. Co*., 836 F.3d 261, 268 (3d Cir. 2016). Here, Debtor annexes to the Complaint the letter engaging Bravo to assist in the HUD application (the "Engagement Letter", Dkt. No. 1-1) and an April 22, 2026, email containing a timeline of events related to the HUD application (the "HUD Timeline", Dkt. No. 1-2).

In assessing the plausibility of the Complaint, this Court will review the claims under New Jersey and/or New York law. Choice-of-law issues are discussed in dicta in the Third Circuit's April 2026 decision in *In re Whittaker Clark & Daniels Inc*, 176 F.4th 241 (3d Cir. 2026). One concurring judge concludes that the Supreme Court's ruling in *Klaxon* applies in bankruptcy—meaning that bankruptcy courts should apply "choice-of-law rules of the state in which the bankruptcy court sits." *Id.* at 277 (Krause, J. concurring) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.,* 313 U.S. 487, 496 61 S. Ct. 1020, 1021, 85 L. Ed. 1477 (1941)). Another concurrence in *Whittaker* suggests that *Klaxon* applies "unless a strong federal interest justifies creating federal choice-of-law rules as a matter of federal common law." *Id*. at 272 (Ambros, J. concurring). Here, neither party argues an overriding federal interest, and the Court finds that none exists; therefore, New Jersey choice-of-law concepts apply. Because New Jersey ordinarily upholds parties' contractual choice-of-law provisions, Court II of the Complaint—the breach of contract claim—is analyzed under New York law, pursuant to the parties' selection. *See, e.g.*, *Chen v. UBS Bus. Sols. US LLC*, No. A-1263-24, 2025 WL 3469008, at *4 (N.J. Super. Ct. App. Div. Dec. 3, 2025) (explaining New Jersey courts will uphold a contractual choice to be governed by the laws of a particular state if doing so does not violate New Jersey's public policy) (quoting *Instructional Sys.,*

*Inc. v. Computer Curriculum Corp.*, 130 N.J. 324, 341, 614 A.2d 124 (1992) (citing *Restatement (Second) of Conflicts of Laws* § 187 (1971))). In the interests of completeness, Counts I and III will be reviewed under both New Jersey and New York law because Debtor is a New Jersey Limited Liability Company, and the subject Property is located in New Jersey, but Defendant Bravo is headquartered in New York.

## IV. Analysis

### A. Count I – Fraudulent or Negligent Misrepresentation

#### 1. Under New Jersey Law

To proceed on a common law fraud claim under New Jersey law,

> a claimant is obligated to establish five elements: (1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages.

*Amherst Farms Homeowners Ass'n, Inc. v. D.M.*, No. A-4057-23, 2025 WL 3687198, at *10 (N.J. Super. Ct. App. Div. Dec. 19, 2025), cert. denied, 265 N.J. 397, 362 A.3d 1061 (2026) (cleaned up); *see also Banco Popular N. Am. v. Gandi*, 184 N.J. 161, 172-73 (2005)). Moreover, A complaint sounding in fraud, must on its face, satisfy the requirements of [New Jersey Court] *Rule* 4:5–8. The heightened fraud pleading requirements set forth in the Rule provide the 'particulars of the wrong, with dates and items if necessary, shall be stated insofar as practicable.'" *State, Dep't of Treasury, Div. of Inv. ex rel. McCormac v. Qwest Commc'ns Int'l, Inc.*, 387 N.J. Super. 469, 484, 904 A.2d 775, 784 (App. Div. 2006) (quoting N.J. Ct. R. 4:5–8(a)). "Failure to state such allegations with requisite particularity may be grounds for dismissal of the claim." *Matter of Est. of Kolbik*, No. A-0782-24, 2026 WL 81510, at *3 (N.J. Super. Ct. App. Div. Jan. 12, 2026); *see*

*also Levinson v. D'Alfonso & Stein*, 320 N.J. Super. 312, 315, 727 A.2d 87, 88 (App. Div. 1999) (citing *Jewish Ctr. of Sussex County v. Whale*, 86 N.J. 619, 432 A.2d 521 (1981)).

In the instant Motion, Defendants assert that the Complaint fails to establish the first element to state a claim for fraudulent misrepresentation because Debtor does not identify *any* misrepresentation—let alone plead that misrepresentation with particularity. *See Mot. to Dismiss* ¶ 40. The Court agrees. The Complaint alleges, generally, that "Bravo made fraudulent and negligent misrepresentations about its ability and intention to file a HUD loan application on behalf of the Debtor." *Complaint* ¶ 42. As an initial matter, nothing in the Complaint or in the Debtor's Response to the Motion discusses or makes specific allegations about Bravo's *ability* to file a HUD loan application. To the contrary, the allegations of the Complaint establish that Debtor retained Bravo for, among other things, "their experience and ability" in filing precisely these types of applications. *Complaint* ¶ 22. Accordingly, the Court's inquiry focuses on Debtor's allegation that Bravo made fraudulent and negligent misrepresentations regarding Bravo's *intention* to file the HUD loan application.

In this respect, Debtor argues that its general allegation regarding Bravo's intent—when viewed in concert with the other allegations of the Complaint and the timeline of events attached to its Complaint—establishes that a fraudulent misrepresentation was made. In other words, Debtor maintains it sufficiently has pleaded that Bravo never intended to file the HUD loan application or, at least, that it never intended to do so in a timely manner. In support of this allegation, Debtor contends that "the only inference this Court can draw . . . is that the [Defendants'] statements are intentionally false, misleading, and fraudulent." *Debtor's Resp.* 10. This argument is conclusory and unavailing and does not convince this Court that the allegations of the Complaint satisfy the first element of a fraudulent misrepresentation claim.

Debtor's Response to the Motion provides a summary of back-and-forth correspondence between Debtor's representatives and Bravo's representatives during the time period between September 2, 2025, and October 31, 2025. However, omitted from the summary in Debtor's Response are certain actions taken by Bravo during that time, as well as actions taken by Bravo outside of that timeframe, as reported in the timeline attached to Debtor's Complaint, which spans November 12, 2024 to November 5, 2025. *See HUD Timeline,* Dkt. No. 1-2. When looking at the "larger picture," the Complaint establishes that Bravo recommended appraisers and professional experts for environmental reports, sent HUD checklists, scheduled and rescheduled inspections, sent HUD applications, requested additional paperwork, and relayed issues with third-party reports. These affirmative actions were taken in furtherance of the HUD loan application and contradict the Debtor's more general accusations regarding Bravo's intent.

Additionally, in the Complaint and in Debtor's Response, Debtor asks this Court to consider the fact that Bravo obtained a $100,000,000 appraisal for the Property in December 2025 as evidence of Bravo's intention to delay the HUD loan. Debtor's argument is that the December 2025 appraisal demonstrates that Defendants stood to benefit from Debtor's failure and, thus, shows and intention to drag their feet on the HUD loan application process. *See Complaint* ¶ 25; *Debtor's Resp.* 10. However, it is unclear to this Court how a December 2025 appraisal can support an inference that an earlier representation was fraudulent. Bravo agreed to submit the HUD loan application in November 2024, and the actions which Debtor maintains show an intent to delay the process were taken in September and October 2025—all of which predate the December 2025 appraisal.

It is also undisputed that Bravo was under no obligation to complete the HUD loan application by any certain date; and no milestones were established. *See Tr. of Sept. 18, 2027 Hrg.*

29:14-24, Dkt. No. 11. Counsel for Debtor conceded this fact during oral argument and confirmed that, prior to September 2025, the Debtor was focused on filling the building to achieve the requisite 85% occupancy to apply for the HUD loan. *Id.* 28:24 – 29:3; *Complaint* ¶ 18. Thus, the Debtor focuses on the "smaller chunk of time, September to November" wherein it says Bravo failed to submit the loan application. *See Tr. of Sept. 18, 2027 Hrg.* 29:1-2. The Complaint narrows this window further, alleging that "[s]tarting in October 2025, Bravo start[ed] creating excuses on why the application is not submitted and intentionally stalling." *Complaint* ¶ 19. However, the timeline attached to the Complaint establishes that—almost immediately after receiving the HUD forms from Debtor in late August—Bravo identified issues with third-party reports and requested additional paperwork. *HUD Timeline,* Dkt. No. 1-2; *see also Tr. of Sept. 18, 2027 Hrg.* 6:20-23 ("[I]t's undisputed that in or around September 2025, certain third-party reports came back with issues, namely environmental problems near the property and debtor's submission of conflicting rent reports."). In October 2025, Bravo sought additional funds to "further investigate environmental," submitted "follow up questions for appraiser," and informed Debtor that Bravo could not "submit [the HUD loan application] with these current 3rd party reports." *HUD Timeline.* Ultimately, the Complaint establishes that Bravo indicated they were "working on a solution" until November 2025. *Id.* Thus, the Debtor's allegation that "Bravo fail[ed] to submit the loan application which had been in their possession since August 26, 2025," *Complaint* ¶ 21, paints an incomplete picture. And, in any event, it does not establish—and certainly not with particularity—that Bravo made any fraudulent misrepresentation.

The Debtor asserts it has pleaded Count I with sufficient specificity to survive a Motion to Dismiss because it "states, with particularity, that Bravo was aware of the limitations of the Debtor's Interest Reserve — specifically the fact that it would expire in six (6) months." *Debtor's*

*Resp.* 9. This fact—accepted as true for purposes of this Motion—does not convert the Debtor's general accusations into a fraudulent misrepresentation pleaded with particularity. First, as discussed, the Complaint establishes that, immediately after receiving the HUD loan documents from the Debtor, Bravo identified legitimate outstanding issues and took active steps toward their resolution. Indeed, Bravo failed—or was unable—to accomplish this within Debtor's desired timeframe. However, the Court cannot overlook that the Complaint confirms that this limited timeframe was created—not by Bravo—but by Debtor, itself: the outer limits of this timeframe established, on one end, by the earliest date the HUD loan application process could proceed after Debtor satisfied the 85% occupancy rate and, on the other end, by the date of exhaustion of Debtor's interest reserve. *See Complaint* ¶ 18 (stating that "Debtor reached 85% occupancy in September 2025"); *id.* ¶ 17 (stating that "Debtor had calculated it would have sufficient interest reserve to carry the BPT loan through December 2025"). Further, the fact that Bravo was aware of the timeline does not constitute a fraudulent misrepresentation, pleaded with particularity. It merely establishes that Bravo was aware of the urgency. And the Complaint confirms that Bravo was still "working on a solution" in November 2025, *HUD Timeline*, while Debtor was attempting to secure alternative financing, *see Complaint* ¶¶ 35-37. Finally, the Court considers that all parties keenly were aware of the possible depletion of the interest reserve and the timing and impact of such an event. Nevertheless, Debtor engaged with Bravo. Given that both parties were aware of the timelines involved—yet proceeded—it is difficult to understand how Bravo's knowledge constitutes a specific allegation of fraudulent misrepresentation.[1]

---

[1] Moreover, given that both parties were aware that Debtor's interest reserve would run out, Debtor cannot use Bravo's knowledge of this fact to plead a claim for fraudulent misrepresentation because Debtor would be unable to establish the fourth element of the claim: that Debtor reasonably relied on the misrepresentation. *Qwest Commc'ns Int'l, Inc.*, 387 N.J. Super. at 485 (quoting *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 610, 691 A.2d 350, 367 (1997)) (establishing fourth element as "reasonable reliance [on the misrepresentation] by the other person"). This element would likewise be absent from a claim for negligent misrepresentation. *See, e.g.*, *Kaufman v. i-Stat Corp.*, 165 N.J.

The Debtor also impliedly asks this Court to consider the fact that "Bravo and BPT are both under the common control of Aaron Krawitz who, as a partner in BPT, stood to gain financially if BPT obtained title to the Debtor's property for the amount of the debt." *Complaint* ¶ 33; *see also id.* ¶43. However, even accepting this allegation as true for purposes of this Motion, nothing in the Complaint indicates that Debtor was unaware of this fact or that Bravo concealed this information. Thus, it does not assist Debtor's argument that it has pleaded fraudulent misrepresentation with particularity.

In sum, the Complaint fails to adequately plead the first element of a claim for fraudulent misrepresentation—namely, it does not plead "a material misrepresentation of a presently existing or past fact." *Qwest Commc'ns Int'l, Inc.*, 387 N.J. Super. at 485 (quoting *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 610, 691 A.2d 350, 367 (1997)). This is a necessary element for this cause of action, and the Court finds that it is not plead with the requisite particularity. For this same reason, the Debtor has failed to plead a claim for negligent misrepresentation. *See, e.g., Myers v. Benucci*, No. A-2507-24, 2026 WL 585808, at *13 (N.J. Super. Ct. App. Div. Mar. 3, 2026) (stating that an "incorrect statement and misstatement of fact are elements of both common law fraud and negligent misrepresentation") (cleaned up); *see also Kaufman v. i-Stat Corp*., 165 N.J. 94, 109, 754 A.2d 1188, 1195 (2000)). Accordingly, Count I of the Complaint is dismissed without prejudice.

### 2. Under New York Law

The Court likewise finds that dismissal of Count I is appropriate when analyzed under New York law. There, a cause of action to recover damages for fraudulent misrepresentation requires "a misrepresentation or a material omission of fact which was false and known to be false by

---

94, 109, 754 A.2d 1188, 1195 (2000) ("The element of reliance is the same for fraud and negligent misrepresentation.").

defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury." *Serba v. Cook*, 250 A.D.3d 765, 767, 261 N.Y.S.3d 121, 124 (2026) (internal quotations and citations omitted); *see also Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 944 N.E.2d 1104 (2011). And, as in New Jersey, such claims must be pleaded with particularity. *See Norddeutsche Landesbank Girozentrale v. Tilton*, 149 A.D.3d 152, 48 N.Y.S.3d 98 (2017) (citing *Eurycleia Partners, LP v. Seward & Kissel, LLP*, 12 N.Y.3d 553, 559, 910 N.E.2d 976, 979 (2009)). Similarly, a claim for negligent misrepresentation under New York law also requires a plaintiff to demonstrate that information provided by the defendant was incorrect. *See Mandarin Trading Ltd.*, 16 N.Y.3d at 180.

For the reasons discussed, Debtor has failed to plead material misrepresentation of a fact to any degree of specificity or allege any inaccurate information relative to Bravo's intention to submit the HUD loan application. Accordingly, Count I—as pleaded—fails under New York law and is dismissed without prejudice.

**B. Count II – Breach of Contract**

Both the Debtor and Defendants analyze the breach of contract claim in the Complaint under New York law because it is bottomed on the Engagement Letter, which contains a New York choice-of-law clause. The parties agree that "[i]t is well settled that the elements of a breach of contract cause of action are 'the existence of a contract, the plaintiff's performance under the contract, the defendant's breach of that contract, and resulting damages'" *Tapp Partners, LLC v. Wall Sections Inc.*, 244 A.D.3d 1727, 1728, 247 N.Y.S.3d 851, 853 (2025) (quoting *Niagara Foods*, *Inc. v. Ferguson Elec. Serv. Co.*, *Inc.*, 111 A.D.3d 1374, 1376, 975 N.Y.S.2d 280 (4th Dept. 2013)). Here, the claim fails because Debtor does not establish the first element: the existence of

a contract that obligates Bravo to do anything beyond assist Debtor in the HUD loan application process.

As Defendants point out, "[t]he The Proposed Loan Terms incorporated into the Engagement Letter provide that, '[n]otwithstanding anything in this Engagement Letter to the contrary, this Engagement Letter is non-binding . . . and is not intended to be, and in no way creates a contract of any kind, including, without limitation, a contract to negotiate, and should not be construed as a binding agreement nor an agreement to enter into a binding agreement.'" *Mot. to Dismiss* ¶ 35 (quoting *Engagement Letter* 10-11, Dkt. No. 1-1). This language is damning to Debtor's breach of contract claim. *See, e.g.*, *Bitter v. Renzo*, 39 Misc. 3d 1208(A), 971 N.Y.S.2d 69 (Sup. Ct.), *aff'd*, 101 A.D.3d 465, 955 N.Y.S.2d 332 (2012) (dismissing breach of contract claim based on non-binding term sheet in which the parties clearly expressed an intent not to be bound); *HP Hotel Sponsor, LLC v. Strategic Cap. Sols., LLC*, 29 Misc. 3d 1204(A), 958 N.Y.S.2d 307 (Sup. Ct. 2010) (explaining that a non-binding letter of intent conclusively negates plaintiff's breach of contract claim); *Aksman v. Xiongwei Ju*, 21 A.D.3d 260, 799 N.Y.S.2d 493, 495 (2005) (same).

The Debtor attempts to argue around this, asserting that "the Loan Agreement forced the Debtor into an untenable situation by restricting its ability to engage anyone in this HUD Application process other than Bravo." *Debtor's Resp.* 12. However, this is the situation into which the Debtor voluntarily placed itself. While the Debtor questions how the Engagement Letter can be both sword and shield for Defendants, the answer is because the Debtor expressly allowed it. The Complaint makes no allegation that the Debtor was forced or coerced into the Engagement Letter and—even if such an allegation was made—it would not support a breach of contract claim but, perhaps, some other cause of action.

The Court does view the Engagement Letter as reflecting an agreement by Bravo to assist and facilitate the Debtor's refinance of the bridge loan through the HUD application process. In this regard, the Court notes that the Complaint alleges, generally, that "Bravo breached its contract with the Debtor by failing to (a) provide the services required by the contract, (b) provide appropriate and professional advice and (c) submit the application to HUD on a timely basis." *Complaint* ¶ 50. However, as discussed, the Complaint and its attachments establish that Bravo performed consistent with the Engagement Letter by—among other things—recommending appraisers and professional experts for environmental reports, sending HUD checklists, scheduling inspections, sending HUD applications, requesting additional paperwork, and relaying issues with third-party reports. And, as Defendants point out, the Engagement Letter contains no concrete milestones or other affirmative obligations or deadlines by which the HUD loan application should have been finalized or submitted. Rather, it defers to Bravo's professional judgement as to when—and whether—to submit the HUD loan application. Finally, the Complaint makes no specific allegations regarding any inappropriate or unprofessional advice provided. Thus, assuming the Engagement Letter could be viewed as a binding contract, the Debtor has not demonstrated a breach. Nothing in Count II establishes Bravo's failure either to meet its obligations under the Engagement Letter or refuse to perform thereunder.

Finally, the Court notes that the allegations in the breach of contract claim mirror those in the fraudulent or negligent misrepresentation claim. Specifically, both claims are premised on the Debtor's assertion that Bravo promised it would submit a HUD loan application on Debtor's behalf in a reasonable and professional timeframe. *See, e.g.*, *Complaint* ¶¶ 22, 29. Notably, the Complaint does not—and cannot—point to any milestone that was missed, or any specific provision of the Engagement Letter that was violated. Given the circumstances and allegations of the Complaint,

the Court could independently dismiss this breach of contract claim as duplicative of the fraudulent or negligent misrepresentation claim. *See, e.g.*, *LaSalle Nat. Bank v. Ernst & Young LLP*, 285 A.D.2d 101, 109, 729 N.Y.S.2d 671, 677 (2001) (dismissing breach of contract claim, which basically alleges a breach of general professional standards, as being redundant to the negligence claims).

For the foregoing reasons, the breach of contract claim is dismissed with prejudice.

### C. Count III – Tortious Interference

#### 1. Under New Jersey Law

To demonstrate a claim for tortious interference, a "plaintiff must show that it had a reasonable expectation of economic advantage that was lost as a direct result of defendants' malicious interference, and that it suffered losses thereby." *Lamorte Burns & Co. v. Walters*, 167 N.J. 285, 305–06, 770 A.2d 1158, 1170 (2001) (citing *Baldasarre v. Butler*, 132 N.J. 278, 293, 625 A.2d 458, 466 (1993)); *see also Printing Mart-Morristown v. Sharp Elecs. Corp*., 116 N.J. 739, 751, 563 A.2d 31, 37 (1989). Here, the Complaint does not adequately plead a claim for tortious interference.[2]

The Debtor's tortious interference claim is premised on Defendants' alleged interference with negotiations between another lender ("Infinity") and the Debtor's principal, Domenick Tonacchio. *Complaint* ¶¶ 35, 55. Because the negotiations at issue were between Infinity and Mr. Tonacchio, it is unclear whether Debtor can establish that it had a reasonable expectation of

[2] The Complaint alleges merely that there was tortious interference with "lending relationships" and does not allege interference with any existing contract. *Complaint* ¶ 55; *id.* at ¶¶ 35-39. Accordingly, the Court analyzes this claim as "tortious interference with prospective economic advantage" as opposed to "tortious interference with a contract." *See, e.g.*, *Carpet Grp. Int'l v. Oriental Rug Importers Ass'n, Inc.*, 256 F. Supp. 2d 249, 288 (D.N.J. 2003) (explaining difference between claim for tortious interference with prospective economic advantage and claim for tortious interference with contractual relations); *Cent. Paper Distribution Servs. v. Int'l Recs. Storage & Retrieval Serv., Inc*., 325 N.J. Super. 225, 233, 738 A.2d 962, 967 (App. Div. 1999) (same).

economic advantage. *See, e.g.*, *Platinum Mgmt., Inc. v. Dahms*, 285 N.J. Super. 274, 305, 666 A.2d 1028, 1043 (Law. Div. 1995) (explaining that the first element requires that "plaintiff must have a reasonable expectation of economic advantage (i.e., plaintiff was 'in pursuit of business')"); *id.* ("**Plaintiff** must show that if there had been no interference, there was a reasonable probability that **it** would have received the anticipated economic benefit.") (emphasis added). Here, it was the Debtor's principal, Mr. Tonacchio, who was "in pursuit of business" and it would have been him—and not Debtor—who would have received the anticipated economic benefit. And the properties involved in the negotiations between Mr. Tonacchio and Infinity (91 Macon Street and 3440 Guider Ave in Brooklyn NY) are wholly unrelated to the Debtor, the Property at issue, and the BPT loan financing the Property.

Admittedly, the Court could not find any authority directly on point to resolve the issue of whether Debtor's tortious interference claim—which alleges interference with negotiations not involving the Debtor—is actionable under New Jersey law. This Court's research suggests that such a claim may be possible but is wholly dependent on the specific facts alleged—many of which are absent here.

First, the Court looks to the concepts underlying the New Jersey cause of action, which has "a long history" in this state. *Lamorte Burns & Co. v. Walters*, 167 N.J. 285, 306, 770 A.2d 1158, 1170 (2001) (citing *Van Horn v. Van Horn*, 56 N.J.L. 318, 28 A. 669 (1893)). The tortious interference claim was designed to protect a plaintiff's "right to pursue one's business, calling, or occupation, free from undue influence or molestation." *Id.* (citing *Printing Mart–Morristown v. Sharp Elecs. Corp.*, 116 N.J. 739, 750, 563 A.2d 31 (1989)). Case law establishes that to plead such a claim, "a plaintiff must show that it had a 'protectable right.'" *Read v. Profeta*, 397 F. Supp. 3d 597, 642 (D.N.J. 2019) (quoting *Printing Mart-Morristown*, 116 N.J. at 751, 563 A.2d 31)).

Additionally, it must be demonstrated "that *but for* the acts of the defendant, the plaintiff 'would have received the anticipated economic benefits.'" *Lightning Lube, Inc. v. Witco Corp*., 4 F.3d 1153, 1168 (3d Cir. 1993) (quoting *Printing Mart–Morristown*, 563 A.2d at 37)) (emphasis in original).

Here, Debtor alleges that the funds from the loan to Debtor's principal "were meant to fund interest payments for the Debtor." *Complaint* ¶ 34; *see also id.* at ¶ 35. Debtor later calls the purpose of these funds into question by stating that they "*could* have been used to assist the Debtor in funding the interest reserve." *Complaint* at ¶ 56 (emphasis added). It is unclear whether these allegations sufficiently "giv[e] rise to some reasonable expectation of economic advantage." *Printing Mart-Morristown*, 116 N.J. at 751. In any event, they do not establish that the "plaintiff was in 'pursuit' of business" or that the Debtor had a "protectable right." *Id.*

For further guidance, the Court looks to § 766B of the Restatement, which addresses "Intentional Interference with Prospective Contractual Relation". It states:

> One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of
>
> > (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or
> >
> > (b) preventing the other from acquiring or continuing the prospective relation.

Restatement (Second) of Torts § 766B (1979). Comment c discusses the "type of relation" the rule protects and explains that it must be one that "would be of pecuniary value to the plaintiff". Here, the "relation" with which Defendants are alleged to have interfered would have pecuniary value to Mr. Tonacchio—not to Debtor. While the Complaint alleges that the value Mr. Tonacchio

was to receive might subsequently benefit the Debtor by funding interest payments, it is unclear whether this is the "type of relation" that the principles underlying the Restatement seek to protect.

Finally, the Court looks to the decisions of its sister courts and identifies a line of cases suggesting that a defendant must have interfered with a plaintiff's direct business relationship in order for a plaintiff to have a cause of action for tortious interference. *See, e.g.*, *Louisiana Pac. Corp. v. James Hardie Bldg. Prods., Inc.*, No. C-12-3433 SC, 2012 WL 5520394, at *1 (N.D. Cal. Nov. 14, 2012) (explaining that an essential element of the tort of interference with prospective business advantage under California law is "the existence of a business relationship with which the tortfeasor interfered" and clarifying that "[a]llegations that amount to a mere hope for an economic relationship and a desire for future benefit are inadequate to satisfy the pleading requirements of this element of the tort") (cleaned up); *Baron Fin. Corp. v. Natanzon*, 471 F. Supp. 2d 535, 539 (D. Md. 2006) ("Tortious interference with business relationships [under Maryland law] arises only out of the relationship between three parties, the parties to a contract or other economic relationship . . . and the interferer.") (quoting *K & K Mgmt., Inc. v. Lee*, 316 Md. 137, 153, 557 A.2d 965, 973 (1989)); *Korea Supply Co. v. Lockheed Martin Corp*., 29 Cal. 4th 1134, 1177, 63 P.3d 937, 957–58 (2003) (Chin, J., concurring and dissenting) (advocating for dismissal of tortious interference claim under California law because the defendant's alleged acts were not directed towards anyone having either an existing or prospective relationship with plaintiff, and suggesting that plaintiffs with remote, indirect, and derivative injuries may not recover); *id.* at 1164–65 (explaining that the intent requirement in a claim for tortious interference—which requires that a "defendant must have engaged in intentionally wrongful acts designed to disrupt the *plaintiff's* relationship" is designed to limit "both the potential number of plaintiffs that may bring a claim under this tort and the remoteness of these plaintiffs to a defendant's wrongful

conduct"); *Rose Hall Ltd. v. Holiday Inns, Inc.*, 146 Ga.App. 709, 247 S.E.2d 173 (1978) (stating that indirect beneficiary could not maintain direct tortious interference claim because it would receive only incidental benefit from contract).[3]

Ultimately, it is unclear whether a plaintiff can assert a direct claim for tortious interference in New Jersey where the interference alleged disrupts negotiations between a third party and a non-party who is not the plaintiff. Likewise, it is unclear what specific allegations must be made regarding the plaintiff's *indirect* expectation of economic advantage to survive a motion to dismiss. For purposes of this Motion, the Court will assume—without finding—that Debtor's claim is actionable and has been sufficiently plead with respect to Debtor's reasonable expectation of economic advantage. *See Fineman v. Armstrong World Indus., Inc*., 980 F.2d 171, 195 n.17 (3d Cir. 1992) ("The parties have not suggested, nor have we been able to find, any New Jersey cases addressing a claim for tortious interference brought by a plaintiff who was not a party to the contract. Assuming without deciding that New Jersey would permit such a claim, we must determine whether this record supports [plaintiff's] individual claim."). Regardless, the Court finds that the claim fails due to Debtor's failure to adequately plead the other elements of a claim for tortious interference under New Jersey law.

In *Printing Mart-Morristown*, the Supreme Court of New Jersey succinctly explained the second element of a tortious interference claim:

> The next inquiry is whether the complaint alleges that defendants' actions were done with the "malice" required to sustain an action for intentional interference with a prospective economic relation. *See Rainier's Dairies v. Raritan Valley*

[3] The Court has located a Third Circuit case interpreting New Jersey law which holds that "a plaintiff seeking to recover for tortious interference must show that the defendant specifically intended to interfere with *that* plaintiff." *Lightning Lube, Inc. v. Witco Corp.,* 4 F.3d 1153, 1170 (3d Cir. 1993) (emphasis in original). That case relies on the Restatement and on *Fineman v. Armstrong World Indus., Inc*., 774 F.Supp. 225, 250–51 (D.N.J.1991), which was subsequently reviewed by the Third Circuit. Thus, this Court does not view *Lightning Lube* as determinative of the question presented. In any event, the claim in *Lightning Lube* addressed a claim for tortious interference with a contract—not a prospective economic advantage.

> *Farms, Inc., supra,* 19 *N.J.* at 563, 117 *A.*2d 889. That element of the cause of action focuses on defendants' behavior. Although the common meaning of malice connotes ill-will toward another person, *Louis Kamm, Inc. v. Flink, supra,* 113 *N.J.L.* at 588, 175 *A.* 62, "[m]alice in the legal sense is the intentional doing of a wrongful act without justification or excuse." *Louis Schlesinger Co. v. Rice, supra,* 4 *N.J.* at 181, 72 *A.*2d 197.

*Printing Mart-Morristown*, 116 N.J. at 756. Debtor likewise acknowledges that the requisite malice is "determined on an individualized basis, and the standard is flexible, viewing the defendant's actions in the context of the facts presented." *Lamorte Burns & Co.*, 167 N.J. at 306; *see also Debtor's Resp.* 14.

Here, the Debtor alleges that Infinity (the third-party lender) "terminated the closing because of Bravo's communication[.]" *Complaint* at ¶ 40. The Complaint then broadly alleges that Defendants' contact with Infinity "was meant to maliciously and tortiously interfere with lending relationships of the Debtor's principal." *Id.* at ¶ 55. These general allegations in the Complaint do not carry the burden.

The most specific allegation of the Complaint contends that Defendants informed an Infinity representative that "the Debtor's principals are problematic and to avoid a loan to them." *Complaint* ¶ 37. But this "specific" allegation is, itself, vague. It provides no details as to *why*—or in *what context*—Defendants made these statements. The Complaint offers no indication of whether this information was provided unprompted, or whether it was given in response to an inquiry by Infinity as part of its due diligence. The Complaint does not detail *in what ways* the Defendants alleged Debtor's principals were problematic; thus, it is unclear from the Complaint whether Defendants relayed truthful information, exaggerated opinions, or outright lies. And the Complaint does not clarify the strength of advice given; i.e. whether Defendants advised that Infinity should avoid loaning to Debtor's principal at all costs, or just in this specific circumstance given timing, amount of

the loan, or property values. Given that the malice element must be considered on a flexible, individualized basis with regard to the context of the facts presented, *see Lamorte Burns & Co*., 167 N.J. at 306, the allegations of the Complaint are insufficient to establish that Defendants acted with the requisite malice—even when viewed in a light most favorable to the Debtor. *See, e.g.*, *Saget v. Wells Fargo Bank*, N.A., No. CIV. 2:13-03544 WJM, 2013 WL 6188638, at *3 (D.N.J. Nov. 26, 2013) (dismissing claim for tortious interference under New Jersey law because the complaint did not contain any factual allegations showing that defendant acted without justification or excuse). *Knierim v. Siemens Corp*., No. CIV.A. 06-4935SDW, 2008 WL 906244, at *17 (D.N.J. Mar. 31, 2008) (finding that vague and conclusory statements did not adequately establish malice).

In their Motion, Defendants urge this Court to look beyond the Complaint to the November 6, 2025, termination email, which the Complaint references. As set forth above, the Court need not do so. The burden is on the Debtor, as plaintiff, to set forth a prima facia claim for tortious interference, *see Printing Mart-Morristown*, 116 N.J. at 756, and Debtor has not done so here. Nevertheless, the Court notes that it "may consider in deciding a motion to dismiss documents that are 'integral to or explicitly relied upon in the complaint' without converting the motion to a motion for summary judgment." *Nekrilov v. City of Jersey City*, 45 F.4th 662, 676 n.7 (3d Cir. 2022) (quoting *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (internal quotations and emphasis omitted)). Were this Court to look to the November 6, 2025, email—which is explicitly referenced in Paragraph 38 of the Complaint—the argument in favor of dismissal becomes stronger. In the email, an Infinity representative explains:

> This loan is being terminated in part due to the sponsor's history of repeatedly attempting to use the court system to negotiate in order to avoid

> acting under the requirements of their loan agreements. This track record can be shown in the litigation notifications disclosure they provided us and some more recent issues they are experiencing on other properties.

*Exhibit F to Certification of Aaron Krawitz in Support of the Motion to Dismiss* 37, Dkt. No. 5-1. This email confirms that the loan was terminated, at least in part, based on the Debtor's principal's prior actions and on litigation history provided by Debtor's principal—much of which also would presumably be available in public court records. The email that Debtor relies upon in support of its claim, thus, undercuts Debtor's assertion that the loan was terminated due to any malice or wrongdoing by Defendants.

For the foregoing reasons, dismissal of this claim under New Jersey law is appropriate.

**2. Under New York Law**

The claim for tortious interference likewise fails under New York law. To state a cause of action for tortious interference with prospective economic advantage in New York, "the plaintiff must allege a specific business relationship with an identified third party with which the defendants interfered." *Influx Cap., LLC v. Pershin*, 186 A.D.3d 1622, 1624, 131 N.Y.S.3d 712, 715 (2020) (citing *Mehrhof v. Monroe–Woodbury Cent. Sch. Dist.*, 168 A.D.3d 713, 714, 91 N.Y.S.3d 503)). For reasons previously discussed, it is unclear whether the Debtor can establish the "specific business relationship" required under New York law given that the negotiations at issue were between Infinity and Debtor's principal—and not the Debtor. *See, e.g.*, *Amaranth LLC v. J.P. Morgan Chase & Co.*, 71 A.D.3d 40, 49, 888 N.Y.S.2d 489, 495 (2009) (finding no "specific business relationship" for tortious interference claim brought by advisers claiming interference with a deal between its fund and the broker because "even assuming that Advisors received substantially all of its revenue from the Fund, the two are nevertheless legally separate entities").

In any event, "the plaintiff must plead 'more culpable conduct' than required for tortious interference with existing contracts." *Id.* (quoting *NBT Bancorp v. Fleet/Norstar Fin. Group*, 87 N.Y.2d 614, 621, 641 N.Y.S.2d 581, 664 N.E.2d 492)). This standard is met when the plaintiff alleges that "the defendant acted for the sole purpose of harming plaintiff or used wrongful means." *Valkyrie AI LLC v. PriceWaterhouseCoopers LLP*, 233 A.D.3d 460, 462, 221 N.Y.S.3d 101, 103 (2024). "As a general rule, such wrongful conduct must amount to a crime or an independent tort, and may consist of physical violence, fraud or misrepresentation, civil suits and criminal prosecutions." *Moulton Paving, LLC v. Town of Poughkeepsie*, 98 A.D.3d 1009, 950 N.Y.S.2d 762, 766 (2012) (internal quotations and citations omitted). Here, as discussed, the Debtor has not established in the Complaint that the Defendants' "conduct was motivated solely by malice or to inflict injury by unlawful means going beyond mere self-interest or other economic considerations." *Bradbury v. Israel*, 204 A.D.3d 563, 564–65, 168 N.Y.S.3d 16, 18–19 (2022). Accordingly, the claim fails under New York law and is dismissed without prejudice. *See, e.g.*, *Influx Cap., LLC v. Pershin*, 186 A.D.3d 1622, 1625, 131 N.Y.S.3d 712, 716 (2020) (dismissing claim where complaint failed to allege that malicious intent or disinterested malevolence was the sole motive for the challenged conduct).

**D. Amended Complaint**

In its Response, Debtor indicates an intent to file an Amended Complaint to assert a claim for civil conspiracy. *See Debtor's Resp.* 18-19, Dkt. No. 8-1. Inasmuch as this Court has dismissed Counts I and III without prejudice, any amended and/or added claims must address and overcome the deficiencies noted in this Opinion.

## V. Conclusion

For the foregoing reasons, the Court grants the Motion to Dismiss. Counts I and III are dismissed without prejudice, and Count II is dismissed with prejudice. Counsel for Defendants are directed to settle a form of Order consistent with this Opinion.

Honorable Michael B. Kaplan
United States Bankruptcy Judge

Dated: November 3, 2026